PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON ELLIS, *et al.*, | ) | |
| | ) | CASE NO.  5:12CV3089 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CITY OF AKRON, *et al.*, | ) | **CORRECTED MEMORANDUM** |
| | ) | **OF OPINION AND ORDER** |
| Defendants. | ) | [Resolving ECF No. 14] |

Pending is Defendants' Motion for Summary Judgment (ECF No. 14).  Defendants move

the Court for summary judgment in their favor on all of the claims in the Complaint (ECF No. 1).

The Court has been advised, having reviewed the record, the parties' briefs and the applicable

law.  For the reasons provided below, the Court finds that Defendant Officer Michael C.

Williams is not entitled to summary judgment on the basis of qualified immunity on Plaintiff

Brandon Ellis's § 1983 excessive-force claim because issues of material fact exists regarding

whether Officer Williams violated Ellis's clearly established constitutional rights.

## I.  Background

On November 20, 2008, Officer Williams participated with other Akron Police Officers

in the execution of a search warrant for illegal drugs on a home in Akron, Ohio.  Ellis was in the

residence at the time the police executed the warrant.  Officer Williams was the first officer to

(5:12CV3089)

enter the residence.  Interview (ECF No. 14-1) at PageID #: 81-82.[1]  Officer Williams stated:

> The ... the lighting downstairs, uh, I believe there was a light on in the living room, I'm not absolutely positive there was a light on in the kitchen, but I could see into the house and I could see, uh, several people running, getting up moving, taking off through the house.
>
> *   *   *
>
> At this point as I'm coming in through the rear door I observed one suspect to my right following our commands we're yelling, ["]Police!  Search Warrant!  Get on the ground!  Police!  Search Warrant!  Get on the Ground!"  And I see a subject to the right get on the ground and sprawl out.  At that point I don't perceive him as a threat.  I look over and I see a subject running out the front door or towards the front door.  At that point his back [is] to me I ... I ... I don't perceive him as a threat and I see three to four males running to my left to what I soon see is a stairwell to the second floor.

ECF No. 14-1 at PageID #: 82.  Officer Williams remained first in line as the officers moved

through the residence to secure it.  Officer Williams continued:

> At that point I ... I proceeded to go up to ... to follow them up the stairs to try and secure them.  We're, uh, yelling, "Police.!  Search Warrant!  Get on the ground!  Get on the ground!  Get on the ground!"  They're still attempting to go up the stairs.  At this same point I can hear a commotion upstairs too.

The parties give conflicting accounts with regard to what happened next.  Ellis's own

Declaration (ECF No. 23-1) states:

> 4.  I believed the home was being robbed so I quickly ran up the steps to the second floor of the home.
>
> *   *   *
>
> 9.  When I got to the top of the stairs I heard someone shout "Police, get on the ground!", or similar words[.]
>
> 10.  I was scared.  I immediately dropped to the floor at the top of all the steps.

---

[1]  On November 25, 2008, Officer Williams gave a Crimes Against Persons Unit ("CAPU") tape-recorded interview at the Akron Police Department regarding his involvement in the incident.

(5:12CV3089)

11. I laid face-down and flat on my stomach with my arms extended out in front of me. My body was laying on the second-floor landing, but my arms extended out above the stairs.

12. My hands were open and I shouted "Don't Shoot!"

13. I could see down the upper stairs and the landing. (See, [ECF No. 23-1 at PageID #: 161])

14. There was no one on the landing at this time.

15. I then saw Officer Williams appear from the right and onto the landing. He had his rifle in his hands and began to move quickly up the second set of steps.

16. There was no one to the right or left of Officer Williams when he was on the second set of stairs.

17. I shouted again, "Don't shoot!" and kept my arms stretched out over the stairs and my hands open.

18. Officer Williams saw me and shot me with his rifle.

19. I felt sharp and immediate pain in my left hand and in my left upper shoulder.

20. I remained laying on the floor with my left arm out over the top of the stairs and my left hand bleeding.

21. After Officer Williams shot me, he continued up the stairs. He did not say anything or offer any assistance to me. He stepped over me when he got to the top of the steps.

22. I was unarmed and did not threaten anyone.

23. No one pushed, shoved or otherwise bumped Officer Williams while he was on the upper stairs or landing[.]

24. No one pushed, shoved or otherwise bumped Officer Williams immediately before he shot me[.]

25. Officer Williams was not struggling or even touching anyone on the stairs or otherwise when he shot me[.]

26. Officer Williams did not fall or fall against the wall on the upper stairs prior to shooting me[.]

27. I never went into the bedroom located at the top of stairs and on the left. (See, [ECF No. 23-1 at PageID #: 161])[ ]

28. I never walked toward or advanced toward Officer Williams[.]

* * *

31. I reviewed my recorded interview from Akron General Hospital when I told Sergeant Garro and Lieutenant Harris that I was upstairs laying on the floor when Officer Williams shot me[.]

32. My statement to the police is true and accurate.

ECF No. 23-1 at PageID #: 154-57.

3

(5:12CV3089)

Officer Williams gave the following, very different, account during his own Interview

(ECF No. 14-1) at PageID #: 76-102.  He declared:

> At that point in time my ... my goal is to get through the house as p ... as fast as
> possible, secure all the suspects, knowing there's people upstairs cause I can hear
> it, um, I'm on the steps and I'm ... there's a ... a ... a log jam on the steps, there's
> three to four suspects and myself and I'm trying to ... I'm screaming at them, "Get
> on the ground!  Get on the ground!  Get on the ground!"  Nobody is getting on the
> ground.  Uh, nobody's following my commands, um, and at that point in time I'm
> trying to get through to get upstairs to address any threats that ... that may be
> upstairs and I ... I know that there are people up there.  Um, again they ... they ...
> they didn't follow our commands and I was ... I was trying to ... to get through
> that area to pro ... to proceed up the stairs.
>                                    *   *   *
> ... I was on that landing with them trying to proceed past to come up the stairs on
> this landing there was at least ... at least three or maybe four and I'm on the ... I'm
> on the landing with them trying to get past ...

ECF No. 14-1 at PageID #: 84.  Officer Williams was on the left side of the landing, with his

rifle shouldered on his left, his right hand up front, and his left finger on the receiver.[2]  ECF No.

14-1 at PageID #: 93-94.  He stated the following about his encounter with Ellis:

> Um, I was, uh, attempting to get past them, I'm looking up the stairs I see a male,
> uh, wearing a white t-shirt it was dark in the stairwell, it was darker than the
> living room where we were coming from, uh, I don't believe there were any lights
> on, uh, the only light I think was the ambient light from possibly outside.  Um, I
> see a figure come out of the left bedroom, I begin giving him commands, "Get on
> the ground!  Get on the ground!  Get on the ground!"  He's not complying with
> my commands, he's still coming towards me.  I start to move forward in my mind
> to get up there to address the threat to put him physically on the ground because
> he is not listening to me.  Um, as I start to move up the stairs I get hit from my
> right side, um, I don't know if it was [on] purpose, an accident but I ... I receive a
> shove from the right side, I hit the wall, when I hit the wall with my left ... with
> my left shoulder arm my gun discharges.  Um, after my gun discharges I ... I
> regain my balance and I proceed up the stairs to the room on the left I ... I see that
> he is ... I see him fall to the ground and I proceed past him and go into the left and

---

[2]  The receiver is the part of a firearm housing that has the serial number on it.

4

(5:12CV3089)

find another subject sprawled out on the ... on the ground that had followed our commands.

ECF No. 14-1 at PageID #: 85.

Officer Williams offers the following explanation for the "accidental" discharge of his rifle:

> *My belief is* ... is when ... when I hit the wall as a result of the jostling my ha ... my finger slipped off the receiver and hit the trigger yes.

ECF No. 14-1 at PageID #: 94 (emphasis added).  *See also* Deposition of Officer Williams (ECF No. 25) at PageID #: 443-46.  He provides the following description of his perception of Ellis at the moment he discharged his rifle:

> Well I ... I perceived him as a threat ... I ... it was dark on the stairwell I ... I could see his left hand and I could tell that there was nothing in it and that's when I said I needed to go up and physically put him on the ground because he was not being compliant with my orders and he was still coming towards me.  Um ...
>
>         *   *   *
>
> He['s not saying anything] ... not to my recollection no I mean but again there's ... there's chaos on that steps there's screaming there's ... there's ...

ECF No. 14-1 at PageID #: 97.  Officer Williams recalled his actions following the shooting:

> At that point in time I ... I ... due to my training I just continued through my mission.  I ... I knew I needed to get up there, I knew that there were possibly still people up there.  I continued to the top of the stairs and I cleared the bedroom on the left hand side from the bedroom ... from which he came out of and found another suspect sprawled out on the ground.
>
>         *   *   *
>
> Yeah it ... it seemed like quite some time but another officer, uh, I believe Sergeant Yohe had made it up the stairs.  Um, Sergeant Yohe was the first one to me and I ... it ... at that point when he came in the room I was still focused on the guy on the floor he was not yet secured which Sergeant Yohe said he would cover him and I secured him with my handcuffs.

ECF No. 14-1 at PageID #: 87.

5

(5:12CV3089)

In December 2008, Ellis was indicted by the Summit County, Ohio grand jury for illegal manufacture of drugs (Count 1), possession of cocaine (Count 2), possessing criminal tools (Count 3), possession of marijuana (Count 4), trafficking in cocaine (Count 5), and having weapons while under disability (Count 12) in Case No. CR-2008-11-3875 D.  ECF No. 14-2 at PageID #: 103-109.  On September 10, 2009, pursuant to a plea agreement with the State, the State amended Count 12 to the lesser and included offense of misconduct in an emergency,[3] to which Ellis pleaded guilty.  Counts 1, 2, 3, 4, and 5 were dismissed upon recommendation of the Prosecuting Attorney.  ECF No. 14-2 at PageID #: 110-11.

On November 19, 2010, Plaintiffs filed a Complaint (ECF No. 1) against Defendants in Case No. 5:10CV2648.  On December 22, 2011, the Court approved the parties' Stipulation of Voluntary Dismissal Without Prejudice (ECF No. 29).

When the case was refiled on December 20, 2012, it was assigned to the docket of the undersigned.  *See* Local Rule 3.1(b)(4).  The Complaint (ECF No. 1) sets forth six Claims for Relief:  First - Excessive Force; Second - Intentional Infliction of Emotional Distress; Third - False Arrest; Fourth - Loss of Services/Consortium;[4] Fifth - Abuse of Process; and Sixth - Governmental Liability.

---

[3] Ohio Rev. Code § 2917.13, a misdemeanor of the fourth degree.

[4] Amber O'Neil, mother of Ellis's son brings this claim on behalf of her son for the loss of services, support, affection, and consortium.

(5:12CV3089)

## II.  Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also* Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant."  *Guarino*, 980 F.2d at 403.  In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

(5:12CV3089)

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact.  *Id.* at 248.  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict.  *Id.*  Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).  The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment.  *Id.*

### III. Analysis

Section 1983, 42 U.S.C. provides a remedy for the deprivation under color of state law of any right, privilege, or immunity secured by the Constitution or laws of the United States.[5]  The elements of a claim under § 1983 are:  (1) the deprivation of a federal right, and (2) the deprivation was committed by one acting under color of state law.  *West v. Adkins*, 487 U.S. 42,

---

[5]  42 U.S.C. § 1983 states in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

(5:12CV3089)

48 (1988); *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994); *United of Omaha Life Insurance Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992). Ellis claims that his constitutional rights were violated when Officer Williams used unreasonable and excessive force, thereby committing an unreasonable seizure against him.

Officer Williams, the only named individual Defendant, asserts the defense of qualified immunity. Government officials performing discretionary functions are shielded from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Gardenhire v. Schubert*, 205 F.3d 303, 310-11 (6th Cir. 2000); *Chappel v. Montgomery County Fire Prot. Dist. No.1*, 131 F.3d 564, 573 (6th Cir. 1997); *Pray v. City of Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995); *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-step inquiry for determining whether an official is entitled to qualified immunity. *Id.* at 201. The Court must consider (1) whether, viewing the evidence in the light most favorable to the injured party, a constitutional right has been violated; and (2) whether that right was clearly established.[6] *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011); *Katz*, 533 U.S. at 201. In *Pearson v.*

---

[6] Some panels of the Sixth Circuit Court of Appeals have employed a three-step qualified immunity analysis, asking, in addition to the *Katz* questions, "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005) (internal quotation marks omitted). "[T]he three-step approach may in some cases increase the clarity of the proper analysis," but "[i]n many factual contexts . . . , including this one, the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." *Id.*

9

(5:12CV3089)

*Callahan*, 555 U.S. 223 (2009), the Supreme Court held that while the sequence set forth in *Katz* is often appropriate, it is not mandatory, and courts have discretion to decide which of the two prongs of the qualified immunity analysis to address first.  *Id.* at 236.

Once a defendant raises the qualified immunity defense, the burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity by alleging facts sufficient to show that the official's act violated clearly established law at the time that it was committed. *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012); *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).  "To defeat the qualified immunity bar, a plaintiff 'must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law.'"  *Id.* (quoting *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994)).  "To make out a *genuine* issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her."  *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009) (emphasis in original).

### A.

Defendants contend that the injury to Ellis was the result of an unintentional and accidental discharge of Officer Williams's rifle.  ECF No. 14 at PageID #: 59.  Defendants argue that "[s]ince there is a complete absence of evidence showing that Officer Williams intended to seize Ellis by the use of deadly force, this Court must conclude that the inadvertent shooting here did not itself violate Ellis'[s] Fourth Amendment rights."  *Tallman v. Elizabethtown Police Dept.*, 167 Fed. Appx. 459, 466-67 (6th Cir. 2006) (holding that it was not unreasonable for the police officer to perceive that plaintiff posed a threat to the officer's safety and for the officer to

10

(5:12CV3089)

have his weapon drawn as he approached the vehicle); *Pleasant v. Zamieski*, 895 F.2d 272, 276-77 (6th Cir. 1990) (accidental shooting did not violate the Fourth Amendment); *Leber v. Smith*, 773 F.2d 101, 104-105 (6th Cir. 1985) (holding that plaintiff's unreasonable-seizure claim failed as a matter of law in an accidental shooting case and, therefore, declining to reach qualified immunity); *Wilson v. Beebe*, 770 F. 2d 578, 584-86 (6th Cir. 1985) (en banc) (holding that due-process was not violated where officer's pistol accidentally discharged as he handcuffed a suspect, and suggesting that an unraised Fourth Amendment claim would have failed); *Watson v. Bryant*, No. 11-60699, 2013 WL 3227633, at *3-4 (5th Cir. 2013) (applying *Pleasant*, *Leber*, and *Wilson* to conclude that in the absence of evidence showing that police officer intended to use deadly force, the negligent shooting did not itself violate arrestee's Fourth Amendment rights).  ECF No. 14 at PageID #: 59-63.

In *Cardona v. City of Cleveland*, No. 97-3037, 1997 WL 720383 (6th Cir. Nov. 10, 1997), Timothy Kilbane, a police officer with the City of Cleveland, alleged that the discharge of his gun was unintentional, but there were two versions of facts relative to how the shooting death of Plaintiff-Appellee's decedent, Zobeyda Rivera, took place.  The Sixth Circuit affirmed the district court's order that qualified immunity was not available on summary judgment.  The Court stated:

> Here, the district court found that two versions of the facts exist:  the one provided by Kilbane and the other suggested by the physical and forensic evidence.  J.A. at 41-42 (Dist.Ct.Op.).  Specifically, in two affidavits and in his deposition, Kilbane testified that the shooting was accidental.  J.A. at 85, 208-09-287.  In contrast, the report of Gregory Kunz and Sergeant Skorich, the detectives assigned to investigate the shooting, notes the autopsy showed that "the shot fired was a close contact (within one-half inch) of the victims head when fired" J.A. at 403.  The report further notes the observation of Sharon Rosenberg,

11

(5:12CV3089)

> the supervisor of the Trace Evidence Section of the Cuyahoga County Coroner's
> Office, that Rivera's hood could have been pulled over her head at the time the
> gun discharged "resulting in the 'graze-type' defect that was observed in the
> coat."  J.A. at 403. . . .
>
> The district court concluded that the physical and forensic evidence raise
> sufficient doubts regarding Kilbane's version of the shooting in two ways.  J.A. at
> 41.  First, the gun's position of one-half inch from Rivera's head, "is strikingly
> dissimilar to" Kilbane's testimony that there was a back and forth struggle for his
> gun.  Second, even if there was such a struggle for the gun, it "seems unlikely"
> that Rivera pulled the gun to within one-half inch of her own head.  J.A. at 41.

*Id.* at *3-4.

Assuming *arguendo* that Officer Williams's actions violated Ellis's Fourth Amendment

rights, according to Defendants, the right in question was not clearly established.  ECF No. 14 at

PageID #: 63.  To determine whether a right is "clearly established," the Court must first look to

the decisions of the Supreme Court, and then to the decisions within the Sixth Circuit.  The

contours of the right must be sufficiently clear that a reasonable official would understand when

his conduct violates the right.  *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002);

*Gardenhire*, 205 F.3d at 311; *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992).

Defendants argue that "Officer Williams' shouldering of his rifle in the high ready position with

his finger on the receiver as he ascended the steps amid uncertain chaos, was [not] so

constitutionally repugnant that no reasonable officer would believe [it] to be lawful, [and

instead] a reflection of plain incompetence."  ECF No. 14 at PageID #: 63-64.

In *Cardona*, the Court dispensed with Officer Kilbane's similar argument that he was

entitled to qualified immunity because there was "no clearly established law that prohibited

Kilbane from having his weapon drawn as he attempted to arrest a suspect fleeing the scene of a

12

(5:12CV3089)

high-speed car chase, a suspect who ignored his repeated commands to get down on the ground."

 1997 WL 720383 at *2.  The Court explained:

> Even if there is no clearly established law which prohibited Kilbane from drawing
> his weapon under the circumstances of this case, that absence does not affect the
> qualified immunity analysis.  The qualified immunity analysis will be applied to
> Kilbane's *use* of deadly force, not just to his decision to draw his weapon.  Thus,
> this alleged error fails to provide a basis for reversing the district court's order
> denying Kilbane's motion for summary judgment.

*Id.* at *4 (emphasis in original).

The rights to be free from unreasonable searches and seizures, including excessive force,

are clearly established rights known to a reasonable officer.  *Pray*, 49 F.3d at 1157; *Adams*, 31

F.3d at 386-87.  In addition, an individual has a clearly established right not to be shot unless he

poses a threat to a pursuing officer or others.  *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th

Cir. 1996); *Russo*, 953 F.2d at 1045; *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir.

1991).  Plaintiffs argue that the shooting itself, not the brandishing of the weapon, was a

violation of his clearly established right to be free from excessive force.  The Court agrees.

**B.**

Defendants also argue that Plaintiffs cannot demonstrate that Officer Williams's conduct

was objectively unreasonable under the Fourth Amendment.  ECF No. 14 at PageID #: 59.  The

apprehension by use of deadly or otherwise excessive force is a seizure subject to the

reasonableness requirement of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386,

394-95 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Phelps v. Coy*, 286 F.3d 295, 299 (6th

Cir. 2002); *Dickerson*, 101 F.3d at 1161.  Whether force was excessive or reasonable is an

objective standard determined based on the totality of the circumstances.  *Dickerson*, 101 F.3d at

13

(5:12CV3089)

1162 (citing *Graham*, 490 U.S. at 395); *Phelps*, 286 F.3d at 299; *Russo*, 953 F.2d at 1044.

Deadly force is justified when an officer has probable cause to believe that a suspect poses a

threat of serious harm to the officer or others.  *Garner*, 471 U.S. at 11.

Reasonableness must be judged from the perspective of a reasonable officer on the scene,

and not with the 20/20 vision of hindsight.  There must be allowance for the fact that police

officers are often forced to make split-second judgments under circumstances that are tense,

uncertain, and evolving rapidly.  *Graham*, 490 U.S. at 396-97; *Wells v. City of Dearborn*

*Heights*, No. 12-1051, 2013 WL 4504759, at *4 (6th Cir. Aug. 26, 2013).  Reasonableness also

can be analyzed in segments, affording distinct consideration to each portion of the conduct as

events evolved.  *Phelps*, 286 F.3d at 301; *Claybrook v. Birchwell*, 274 F.3d 1098, 1103-1104

(6th Cir. 2001); *Dickerson*, 101 F.3d at 1162.

### C.

Whether Officer Williams acted reasonably depends upon whose version of the facts is

accepted.  Summarizing the interview testimony quoted above, Officer Williams gave the

following version of events.  When he proceeded as the lead officer up the left side of the stairs

to the second level, the suspects in the house created a chaotic logjam situation on the stairs.

Officer Williams saw a person come out of the left bedroom, he begins giving him a command:

"Get on the ground!  Get on the ground!  Get on the ground!"  He's not complying with Officer

Williams's commands, he's still coming towards him.  Somebody knocked Officer Williams

against the stairway wall, causing him to unintentionally discharge his weapon, shooting Ellis in

his left hand and shoulder.

14

(5:12CV3089)

Again summarizing the declaration testimony quoted above, Ellis gave the following, considerably different, version of events.  He immediately dropped to the floor at the top of all the steps when he heard someone shout "Police, get on the ground!", or similar words.  He laid face-down and flat on his stomach with his arms extended out in front of him.  From this vantage point, he could see down the upper stairs and the landing while his body was laying on the second-floor landing.  His hands were open and he shouted "Don't Shoot!"  There was no one on the landing at this time.  Ellis then saw Officer Williams appear from the right and onto the landing.  He had his rifle in his hands and began to move quickly up the second set of steps.  There was no one to the right or left of Officer Williams when he was on the second set of stairs.  Ellis shouted again, "Don't shoot!" and kept his arms stretched out over the stairs and his hands open.  Officer Williams saw and shot Ellis in the left hand and left upper shoulder with his rifle.  Officer Williams's AR-15 military semi-automatic rifle blew off Ellis's middle and ring fingers of his left hand.  No one pushed, shoved or otherwise bumped Officer Williams while he was on the upper stairs or landing.  No one pushed, shoved or otherwise bumped Officer Williams immediately before he shot Ellis.  Officer Williams was not struggling or even touching anyone on the stairs or otherwise when he shot Ellis.  Officer Williams did not fall or fall against the wall on the upper stairs prior to shooting Ellis.  Ellis never went into the bedroom located at the top of stairs and on the left.  Ellis never walked toward or advanced toward Officer Williams.  Ellis, who was unarmed and did not threaten anyone, was left severely injured and permanently disfigured.

15

(5:12CV3089)

Ellis submits the report of David E. Balash (ECF No. 46-1), their forensic ballistics

expert,[7] who opines that, at least assuming much of the Plaintiffs' version, Officer Williams

acted unreasonably.

> The comment by Officer Williams that while holding his weapon with his left
> hand and supporting the weapon with his right hand, he was pushed into the wall
> along his left side and that this pushing action caused his finger to come off the
> frame of his weapon, then into the trigger guard of his weapon and to also then
> pull the trigger of his weapon is totally unbelievable and without foundation in
> this [examiner's] opinion. . . .
>
> *    *    *
>
> Officer Williams stated that Mr. Ellis was upright when he fired his weapon and
> Mr. Ellis stated that he was lying prone on the upstairs floor with his hands in
> front of him at the time he was shot.  The evidence clearly supports Mr. Ellis's
> version of the shooting event and contradicts Officer [Williams's] version of the
> shooting event.

ECF No. 46-1 at PageID #: 859-60.

In addition, Plaintiffs argue that Officer Williams's account is largely inconsistent with

his fellow officers.  ECF No. 23 at PageID #: 134.  During his interview, Officer Williams did

not indicate to his supervisor, Det. Sgt. Michael Yohe, that the shooting was accidental or

unintentional.

---

[7] On October 23, 2013, Defendants objected to Plaintiffs' expert report of David
Balash on the grounds that it is untimely under Fed. R. Civ. P. 26(a)(2)(D)(i), the Federal
Rule governing expert discovery.  See ECF No. 52.  This objection may have merit if the
case goes to trial on November 12, 2013.  It is undisputed that the expert report (ECF No.
46-1) was disclosed on August 25, 2013, see ECF No. 55-1; ECF No. 57 at PageID #:
989, which is less than "90 days before the date set for trial."  See Gowens v. Tidwell, No.
10-10518, 2013 WL 2285446, at *4 (E.D. Mich. May 23, 2013) (expert testimony not
excluded where the City withdrew its objection to the report when the trial date was
adjourned and rescheduled).

(5:12CV3089)

Det. Sgt. Yohe stated during his CAPU interview in November 2008:

. . . I, uh, as I'm clearing that room I asked Officer Williams, "if he's okay?"  He says, "he's okay."  Um, I asked him something to the effect of, uh, uh, you know whose ... where's the gun or you know who ... something to the effect of where's the gun and he[ ] says, "I ... I'm the only one that fired or I ... I fired my weapon." I said, "okay are you all right?"  And he said, "yes," . . . I said well, uh, "it will be okay."  I said, "Mike just secure him [a different suspect]."

*    *    *

Um, no [at this point] I did not [have any idea why Officer Williams fired].

ECF No. 23-4 at PageID #: 197-98.  When asked "Well did it ... did anything that [Officer Williams] communicate give you the impression that he had fired the weapon intentionally as opposed to unintentionally?", Det. Sgt. Yohe responded "[t]hose ... those ... no those comments were never made by him, um, at that time and I ... and then afterwards, uh, didn't ... didn't discuss that with him after the shooting. . . ."  ECF No. 23-4 at PageID #: 208.

The gravamen of the difference between the two versions amounts to whether the shooting occurred incident to an unintentional and accidental discharge of Officer Williams's rifle, or whether Officer Williams intentionally shot Ellis.  In the details, the parties differ on at least the following facts relevant to whether Officer Williams acted reasonably:  (1) whether Ellis complied with Officer Williams's commands to get on the ground or stood up in Officer Williams's presence before getting shot; (2) whether Ellis was still coming towards Officer Williams prior to being shot; (3) whether Ellis was saying anything before he was shot; (4) whether Ellis could see down the upper stairs and the landing before he was shot; and (5) whether anyone pushed, shoved or otherwise bumped Officer Williams immediately before he shot Ellis.

(5:12CV3089)

**D.**

The existence of qualified immunity ordinarily is a question of law, *Chappel*, 131 F.3d at 573, and Plaintiffs bear the ultimate burden of proof that Officer Williams is not entitled to qualified immunity.  *Gardenhire*, 205 F.3d at 311; *Pray*, 49 F.3d at 1158.  Summary judgment, however, is not appropriate when a genuine issue of material fact exists on a question on which the immunity turns.  *Gardenhire*, 205 F.3d at 311; *Dickerson*, 101 F.3d at 1158.  A jury becomes the final arbiter of an immunity claim when resolution of the issue depends upon which view of the facts is accepted.  *Pray*, 49 F.3d at 1161; *Adams*, 31 F.3d at 387; *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (When "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," the District Court cannot grant a police officer immunity from a deadly force claim).  Because of the factually different versions of events, summary judgment is not appropriate on the defense of qualified immunity.  *Sample v. Bailey*, 337 F. Supp.2d 1012, 1021 (N.D. Ohio 2004) (Dowd, J.) ("Whether [the police officer]'s actions were reasonable is contingent on the fact-finder's resolution of that factual conflict."); *Owl v. Robertson*, 79 F. Supp.2d 1104 (D. Neb. 2000).  A jury must choose between the two conflicting accounts.

**IV.  Conclusion**

Viewing Plaintiffs' probative evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiffs, the Court concludes that there are genuine issues of material fact and Officer Williams is not entitled to a judgment as a matter of law on Ellis's § 1983 excessive-force claim.

18

(5:12CV3089)

For the foregoing reasons,

Defendants' Motion for Summary Judgment (ECF No. 14) on the First Claim for Relief

is denied on the basis of qualified immunity.  The Court reserves ruling on whether Defendants

are entitled to summary judgment on the Second through Sixth Claims for Relief.[8]  Counsel are

reminded that this case is set for trial on November 12, 2013.  *See* Order (ECF No. 18).


IT IS SO ORDERED.


 October 29, 2013                          /s/ Benita Y. Pearson
Date                                     Benita Y. Pearson
                                         United States District Judge

---

[8]  During the telephonic status conference held on October 10, 2013, the Court advised lead counsel of record that it would reserve ruling on whether Defendant City of Akron is entitled to summary judgment on the municipal liability claim (Sixth Claim for Relief).

19